IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| ALPRENTISS NASH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CHICAGO POLICE OFFICER MICHAEL | ) | |
| BAKER, star no. 20316; CHICAGO POLICE | ) | Case No. _____ |
| OFFICER DAVID FIDYK, star no. 17314, | ) | |
| CHICAGO POLICE OFFICER JOHN FORD, | ) | |
| star no. 13047; CHICAGO POLICE OFFICER | ) | |
| JOEL HOWARD, star no. 20933; CHICAGO | ) | |
| POLICE OFFICER GEORGE KARL, star no. | ) | |
| 20356; CHICAGO POLICE OFFICER | ) | |
| THADDEUS MACUDZINSKI, star no. 12930; | ) | |
| CHICAGO POLICE OFFICER JOHN SOLECKI, | ) | |
| star no. 20378; CHICAGO POLICE OFFICER | ) | |
| NEIL SPENCER, star no. 20309; UNKNOWN | ) | |
| CHICAGO POLICE OFFICERS; and CITY OF | ) | |
| CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | Jury Trial Demanded |

## COMPLAINT

NOW COMES Plaintiff, ALPRENTISS NASH, by and through his attorneys,

KATHLEEN T. ZELLNER & ASSOCIATES, P.C., complaining of Defendants, CHICAGO

POLICE OFFICERS MICHAEL BAKER, DAVID FIDYK, JOHN FORD, JOEL HOWARD,

GEORGE KARL, THADDEUS MACUDZINSKI, JOHN SOLECKI, and NEIL SPENCER;

UNKNOWN CHICAGO POLICE OFFICERS; and the CITY OF CHICAGO, and states as

follows:

## Introduction

On April 30, 1995, Alprentiss Nash was arrested for a crime he did not commit.  He was

subsequently convicted and served 17 years in prison.  In 2012, DNA testing exonerated Nash.

The charges against him were dropped and he was issued a certificate of innocence. Defendants

caused Nash's prosecution to commence and continue without probable cause. They coerced

witnesses to falsely implicate Nash during the investigation and at trial. They also discarded,

ignored, and most importantly, concealed, highly exculpatory evidence in the process. Nash

suffered severe physical and emotional damages throughout his 17-year incarceration. These

damages were exacerbated by the fact that he knew he was innocent.

## Jurisdiction and Venue

1.      This is a civil rights action brought pursuant to 42 U.S.C. § 1983 et seq. to redress

the deprivation under color of law of Plaintiff's rights as secured by the United States

Constitution.

2.      This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343(a),

and 1367(a).

3.      Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to

Plaintiff's claims occurred in this judicial district and the parties resided in this judicial district at

the time the events took place.

## The Parties

4.      Plaintiff Alprentiss Nash ("Plaintiff" or "Nash") was at all relevant times herein a

resident and citizen of the State of Illinois.

5.      Defendant Michael Baker ("Defendant Baker") was at all times relevant herein

employed as a police officer in the Chicago Police Department.

6.      Defendant David Fidyk ("Defendant Fidyk") was at all times relevant herein

employed as a police officer in the Chicago Police Department.

7.      Defendant John Ford ("Defendant Ford") was at all times relevant herein employed as a police officer in the Chicago Police Department.

8.      Defendant Joel Howard ("Defendant Howard") was at all times relevant herein employed as a police officer in the Chicago Police Department.

9.      Defendant George Karl ("Defendant Karl") was at all times relevant herein employed as a police officer in the Chicago Police Department.

10.      Defendant Thaddeus Macudzinski ("Defendant Macudzinski") was at all times relevant herein employed as a police officer in the Chicago Police Department.

11.      Defendant John Solecki ("Defendant Solecki") was at all times relevant herein employed as a police officer in the Chicago Police Department.

12.      Defendant Neil Spencer ("Defendant Spencer") was at all times relevant herein employed as a police officer in the Chicago Police Department.

13.      Defendant Unknown Chicago Police Officers were at all times relevant herein employed as police officers in the Chicago Police Department.

14.      Defendant City of Chicago is a duly incorporated municipal corporation and at all relevant times was the employer of Defendants Baker, Fidyk, Ford, Howard, Macudzinski, Karl, Solecki, Spencer, and Unknown Chicago Police Officers (collectively "Defendant Officers"). The City of Chicago is liable for the wrongful acts of the Defendant Officers while acting within the scope of their employment, pursuant to its statutory obligation to indemnify them.

15.      Each of the police officer defendants engaged in the conduct complained of under the color of state law and in the course and scope of his employment as a police officer with the City of Chicago.

16.      Each of the police officer defendants is sued in his individual capacity.

**Allegations of Fact**

*Nash's Prior Run-In with Area 2 Officers*

1.      In the winter of 1994, Nash was stopped and searched by two Area 2 Chicago police officers without probable cause or reasonable suspicion.  The officers found a bag of marijuana.  The officers told Nash that they were not going to arrest him, but they were going to take all of his money and his beeper.  They told him that he would "be sorry" if he told anyone.

2.      Nash had told people in the neighborhood about being robbed by two Area 2 police officers.

3.      All Defendant Officers were Area 2 officers.

*Murder of Leon Stroud*

4.      Leon Stroud ("Stroud") lived on the 11000 block of Wentworth Avenue in Chicago, Illinois.  He was a noted "bootlegger" in the neighborhood.  He sold alcohol, cigarettes, and crack cocaine out of his home.

5.      At around 1:45 p.m. on April 30, 1995, three masked men entered Stroud's home and robbed him.  One of the masked men shot Stroud in the chest.

6.      A woman opened the door to a back bedroom in Stroud's home and looked out into the living room.  She saw the three masked men, one of whom was holding a handgun.  The woman closed the door and the three masked men fled from the home.

7.      One of the robbers' masks was left at the scene.  The mask was taken into custody by the police, but it was never tested for DNA, fingerprints, or any other forensic evidence.

*Jean Collins Advises Defendants There Were Three Masked Men*

8.      Defendant Fidyk was among the first police officers to arrive at the scene.

9.      Defendant Fidyk interviewed Jean Collins.

10.     Ms. Collins advised Defendant Fidyk that she was in the back bedroom of the Stroud home when she heard a gunshot.  She opened the bedroom door and looked down the hallway.  There she saw <u>three masked men</u>, one of whom was holding a gun.   Ms. Collins did not see anyone other than the three masked men and Stroud.

11.     Ms. Collins stated that she immediately closed the door and fled alone out the bedroom window.  She turned toward the gangway between Stroud's home and the neighbor's home.  Two of the masked men came running down the gangway and knocked her over.

12.     Ms. Collins advised that she could not identify the men because of the masks.

13.     Defendant Karl interviewed Ms. Collins the same day.  Ms. Collins provided the same information to Defendant Karl as she did to Defendant Fidyk.

***Matthew Rollins Confirms There Were Three Men, Identifies Alvin Wyatt***

14.     Defendant Ford arrived at the scene shortly after Defendant Fidyk.

15.     Defendant Ford was approached by Matthew Rollins ("Rollins").  Rollins advised Ford that, minutes before the shooting, he observed Alvin Wyatt ("Wyatt") emerge from the Stroud home.

16.     Rollins told Ford that he then observed Wyatt walk down the street and into the gangway between his home and Wyatt's house to the south.  Wyatt met with <u>two</u> other men in the gangway.

17.     Rollins <u>could not identify</u> either of the other men, as they faced away from him and he could not view their faces from his vantage point.

18.     Rollins advised Ford that the three men walked in the direction of Stroud's home.

19.     Rollins advised Ford that after he heard a gunshot, he observed Wyatt flee from the Stroud home.

20.     Wyatt was subsequently taken into custody and interviewed by Defendant Karl. Wyatt denied playing any role in the home invasion and murder or knowing who did.

**Paul Harris Places Himself at the Scene with Motive**

21.     Defendant Officers learned that Paul Harris ("Harris") was also seen around the Stroud home at the time of the murder.

22.     Harris was interviewed by police at the scene.

23.     Harris admitted that he was inside the home at the time of the home invasion and murder.  He claimed, however, that he was an innocent bystander to a robbery gone wrong by a lone masked man who entered Stroud's home, robbed everyone therein, and shot Leon Stroud.

24.     Harris stated that he could not identify the alleged robber.

25.     Harris claimed that after the shooting he ran into the back bedroom where Collins was.  He claimed that he then helped Collins out the window, before exiting the window himself.

26.     Because they had already interviewed Collins, Defendants knew Harris's statements were false.

27.     In addition to admitting being at the scene at the time of the murder and providing a false statement, Harris admitted to police that he knew Stroud had a lot of money, that he knew Stroud kept his money in his wallet, that Harris had no money—only a quarter to his name, that Harris smoked crack cocaine, and that Harris knew Wyatt very well.   Defendant Officers were aware that Harris was in the same gang as Wyatt.  It was clear that Wyatt and Harris were two of the three men seen by Collins and Rollins.

**Defendants Frame Nash**

28.     Rollins was re-interviewed by Defendants Baker and Solecki hours after the shooting.  Defendants were aware that Rollins was a close friend of Harris's.

29.     Rollins stated for the first time that he saw only one man in the alley with Wyatt. Rollins further stated that he did not and could not identify the (now one) other person in the alley.

30.     On information and belief, in a rush to close the case, Defendant Officers physically and/or verbally coerced Rollins to change his statement to align with Harris's.

31.     Defendant Officers knew that Rollins' new statement was completely unreliable and fabricated.

32.     Seeing an opportunity to quickly resolve a case involving the death of a bootlegger in a poor neighborhood by arresting Nash, a drug dealer from the neighborhood who had been claiming to others that Area 2 officers had robbed him, Defendants conspired to frame Nash.

33.     Defendant Karl re-interviewed Wyatt.  He told Wyatt that Rollins had seen him in the gangway with one other man just prior to the murder.  Defendant Karl utilized physically and/or verbally coercive techniques in an attempt to get Wyatt to state that he had met one person in the gangway and it was that person who committed the shooting.  Among other things, Defendant Karl told Wyatt that he would not be charged and would not go to jail if he admitted as much.

34.     Wyatt eventually succumbed to Defendant Karl's coercion.  He stated he did meet a man in the gangway.  He explained that this man proposed robbing Stroud, and this man eventually shot Stroud during the robbery.  Wyatt only knew the man as "Moose."

35.     On information and belief, the remaining Defendant Officers were aware of the coercive techniques utilized Defendant Karl, but did not act to prevent him from utilizing them

against Wyatt.  Defendant Officers did not disclose the techniques used by Defendant Karl or the unreliability of Wyatt's statement to the prosecutors or defense before, during, or after trial.

36.     Wyatt knew Nash by name and owed him $350 at the time.  He had purchased drugs from Nash earlier that day.  Wyatt knew Nash's nickname was "Lemeke," not "Moose."

37.     "Moose" was the nickname of Demetrius Loggers, another man who lived in the neighborhood.

38.     On information and belief, Defendant Officers were aware that Loggers's nickname was "Moose."

39.     As alleged in further detail below, Loggers's DNA was discovered on the mask found at the scene.

40.     Defendants Baker, Solecki, Karl, and others drove Wyatt to Nash's home. Defendant Baker retrieved a photo of Nash from the residence.  He brought the photo out to the car and showed Wyatt.

41.      On information and belief, Wyatt repeatedly denied that the man in the photo was "Moose."  He told them the man in the photo was Nash, also known as "Lemeke."

42.     On information and belief, Defendants Baker, Solecki, and Karl used physically and/or verbally coercive techniques in an effort to get Wyatt to identify the man in the photo as "Moose."  Among other things, Defendants told Wyatt that he would be charged with murder and go to jail unless identified the person as "Moose."  Wyatt eventually gave in and stated that the person in the photograph was indeed "Moose."

43.     On information and belief, Defendants Baker, Solecki, and Karl fabricated police reports and testified falsely at trial to reflect a positive identification of Nash as "Moose" without denial, equivocation, coercion, or manipulation.

*Defendants Arrest Nash and Confirm His Airtight Alibi*

44.     At around 9:00 p.m., Defendant Officers apprehended Alprentiss Nash without probable cause.

45.     Nash was interviewed by Defendants Solecki and Baker at Area 2 Headquarters.

46.     Nash produced an airtight and verifiable alibi.  He stated that he sold drugs from 11:00 a.m. to 11:30 a.m. at the corner of 119th Street and Perry Avenue.

47.     By early afternoon, Nash had accumulated over $600 in cash.  Nash explained that he earned between $1500 and $2000 a week.  He had no reason to rob Stroud.

48.     At around 1:00 p.m., Nash went to Boone's Liberty Cab, located at 117th Street and Michigan Avenue.  He hired a man named Freddie to drive him to Maxwell Street to shop. Freddie had driven Nash on numerous occasions in the past.

49.     On Maxwell Street, Nash shopped at Bryer's.  He purchased a pair of blue overalls, some navy blue gym shoes, a three quarter length black bloomers jacket, and a snake skin baseball hat.

50.     Nash explained that he shopped at Bryer's on a regular basis.  The employees, including "Mother Bryer," knew him by name.

51.     Nash told the officers he returned home at about 4:30 p.m.  He changed into the clothes he bought at Bryer's.  He was later arrested in those unique clothes.

52.     On information and belief, Defendants Baker and Solecki interviewed Freddie the cab driver on or around May 1, 1995.  On information and belief, Freddie confirmed that Nash hired him as his driver on April 30, 1995, that he drove Nash to Maxwell Street at around 1:00 p.m., and that he drove Nash back from Maxwell Street at around 4:00 p.m.

53.     On information and belief, Defendants Baker and Solecki interviewed "Mother Bryer" and at least one other Bryer's employee on or around May 1, 1995.  On information and belief, Mother Bryer and the other employee confirmed that Nash had been shopping in Bryer's during the relevant times on the afternoon of April 30, 1995, and he had purchased the items he discussed with the police.

### *Defendants Howard and Spencer Conduct Unduly Suggestive Lineups*

54.     Rollins was brought to the police station for a lineup conducted by Defendants Howard and Spencer.  On information and belief, Defendants Howard and Spencer conducted the lineup in an improperly suggestive manner, and induced Rollins to falsely identify Nash.

55.     Even aside from the improper suggestion, Defendants Howard, Spencer, and the other Defendant Officers knew Rollins's identification was unreliable and false.  Rollins had not previously identified Nash despite knowing him for years by name and nickname.  Rollins had repeatedly stated to Defendants Baker, Solecki, Ford, Howard, and Spencer that he would not be able to identify anyone other than Wyatt.  Defendant Officers were aware that Rollins, based on his story about where the individuals were situated in the gangway and the angle from which he viewed them, it would have been impossible for Rollins to identify anyone other than Wyatt.  Defendant Officers concealed this information from the prosecutors and defense.

56.     Harris was brought to the police station for a lineup conducted by Defendants Howard and Spencer.  On information and belief, Defendants Howard and Spencer conducted the lineup in an improperly suggestive manner, and induced Rollins to falsely identify Nash.  Defendants concealed this fact from the prosecutors and defense.

57.     Harris's identification was based solely on the Nash's voice and stature, as the gunman was wearing a mask.

58.     Defendant Officers knew Harris's identification was false.  Defendant Officers knew that Harris had known Nash for years, such that he would have known Nash's voice and stature.  If Nash was the shooter, Harris would have been able to identify Nash at the scene, as he would have recognized his "voice and stature" in the Stroud home.

***Defendant Officers Conceal All Exculpatory Evidence***

59.     In the manner described above and below, Defendant officers maliciously, intentionally, and with reckless disregard to Plaintiff's constitutional rights, concealed and withheld material exculpatory and impeachment information from the prosecutors and defense before, during, and after Plaintiff's criminal trial.

60.     On information and belief, Defendants Baker and Solecki concealed from the prosecutors and defense the fact they had interviewed Freddie, and he confirmed Nash's alibi.

61.     On information and belief, Defendants Baker and Solecki concealed from the prosecutors and defense the fact they had interviewed Mother Bryer and another Bryer's employee, and both of them confirmed Nash's alibi.

62.     Defendant Solecki falsely testified that Nash did not mention Freddie or Bryer's during the interrogation.  Defendant Solecki concealed any and all information about Freddie and Bryer's from the prosecutors and defense.

63.     On information and belief, Defendants Baker, Solecki, and Karl concealed from the prosecutors and defense the fact that Wyatt had stated that Nash was not "Moose," and that he only agreed to say Nash was "Moose" after physical and/or verbal coercion and manipulation from Defendant Officers.  Defendant Officers falsified reports and testified falsely at trial to reflect an identification of Nash as "Moose" without denial, equivocation, coercion, or manipulation.

64.     On information and belief, Defendant Officers concealed from the prosecutors and defense the fact that "Moose" was the nickname of Demetrius Loggers.

65.     Defendants Fidyk and Karl concealed from the prosecutors and defense exculpatory and impeachment information they learned of during their respective interviews with Jean Collins, wherein she stated that there were <u>three masked men in the home</u>, that she did not see anyone other than the three masked (i.e., an unmasked Wyatt or Harris) men in the home, that she left out the back bedroom window <u>alone</u>, and that two of the masked men knocked her over while they were fleeing from the home.

66.     Defendants Fidyk and Karl fabricated their reports and testified falsely at trial regarding their respective interviews with Jean Collins to corroborate the coerced, manipulated, and false statements of Wyatt, Rollins, and Harris.  Their reports and testimony falsely state that Ms. Collins observed only one masked man in the home, that either Wyatt or Harris accompanied her out the back window, and that she made her way to the front of the home without incident.

67.     Defendants Baker and Solecki concealed from the prosecutors and defense the exculpatory fact that they coerced and/or manipulated Rollins to change his story from seeing three men in the gangway to just two.

68.     Before the Defendants began their efforts to frame Nash, Defendant Ford advised Defendant Macudzinski, the officer responsible for creating a report, that Rollins told him that he saw Wyatt meet with <u>two</u> men in the gangway prior to the murder.  Defendant Macudzinski created a report reflecting this information.  Defendant Ford later lied to the prosecutors and at trial, stating that Rollins never told him that there were two men other than Wyatt in the gangway and further stating that the report was erroneous.   Defendant Macudzinski falsely told the

prosecutors and testified at trial that he did not take notes of his conversations with Defendant Ford at the scene after the Rollins interview, and that he may have made a mistake in the report when he wrote that Rollins saw Wyatt with two men in the gangway.

69. Each Defendant Officer who met with Rollins concealed from the prosecutors and defense the fact that Rollins had consistently stated he could not identify anyone other than Wyatt in the gangway prior to the murder.

70. Defendants Howard and Spencer concealed from the prosecutors their unduly suggestive conduct during the lineups and the unreliability of Rollins's and Harris's false identifications. Defendants Howard and Spencer falsified their reports to reflect non-suggestive lineups and reliable identifications.

### *Nash is Charged and Convicted*

71. No physical evidence connected Nash to the crime in any way. The State's decision to press charges and its case to the jury was based entirely on Defendant Officers' false representations and reports regarding the manipulated, fabricated, and false statements and identifications by Rollins, Wyatt, and Harris, as well as Defendant Officers' malicious concealment of material evidence.

72. Defendant Officers continued to coerce and/or otherwise manipulate and influence witnesses, including Wyatt, Rollins, and Harris, to testify falsely at trial.

73. Nash's trial counsel argued that Wyatt and Harris committed the robbery and murder together with a third party.

74. At the conclusion of his trial, Nash was convicted of murder. For the next 17 years, Nash worked tirelessly to prove his innocence.

### DNA Evidence Exonerates Nash

75.     On October 28, 2007, Nash filed a *pro se* motion pursuant to section 116-3 of the Code of Criminal Procedure seeking DNA testing on the mask discovered at the scene.

76.     On March 5, 2010, the Illinois Appellate Court granted the motion, noting that "the evidence presented against the defendant at trial was significantly less than conclusive." The appellate court pointed out that Rollins originally told an officer that he saw two men in the gangway with Wyatt; that it made no sense for Harris to identify Nash by voice and stature for the first time at the station because he *knew* Nash and should have been able to identify his voice when he heard it; that Wyatt did not initially implicate anyone and only did so after he was improperly incentivized by the officers; and that any DNA on the mask other than Nash's would go a long way to showing his actual innocence.

77.     On September 22, 2010, Nash was excluded as a contributor to either of the DNA profiles discovered on the mask.

78.     Subsequent testing performed on the mask revealed a major profile that once again excluded Nash. The major profile was searched against the DNA Index and detected an association with Demetrius Loggers, also known as "Moose."

### Post-Conviction Proceedings and Dismissal of All Charges

79.     On February 24, 2011, Nash filed a petition for post-conviction relief, asserting actual innocence based upon the DNA results. On August 30, 2012, the State withdrew its opposition, the petition was granted, and the State dismissed all pending charges.

80.     On September 7, 2012, Nash filed a petition for certificate of innocence. This petition was unopposed by the State and granted on November 9, 2012.

*Nash's Damages*

81.     Nash was wrongfully incarcerated from April 30, 1995 to August 30, 2012.  As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Nash sustained injuries and damages including loss of his freedom for over 17 years, pain and suffering, severe mental anguish, emotional distress, loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

### COUNT I
**42 U.S.C. § 1983 - 14th Amendment Due Process**
**Destruction and/or Concealment of Material Exculpatory and Impeachment Evidence**
**(Defendant Officers)**

82.     Each paragraph of this Complaint is incorporated as if restated fully herein.

83.     In the manner described above and alleged herein, Defendant Officers concealed and/or destroyed material exculpatory and impeachment evidence from Plaintiff and from prosecutors before, during, and after Plaintiff's criminal trial, causing the prosecution against Plaintiff to commence and continue for more than 17 years.

84.     In concealing and/or destroying the material exculpatory and impeachment evidence, Defendant Officers acted maliciously, intentionally, and with willful and wanton disregard for Plaintiff's constitutional rights.

85.     Defendant Officers' actions directly and proximately caused the injuries and damages to Plaintiff as claimed above, and constitute a due process violation under the 14th Amendment of the U.S. Constitution.

WHEREFORE, Plaintiff, Alprentiss Nash, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorney's fees, and costs against Defendants as well as any other relief this Court deems just and appropriate.

## COUNT II
### 42 U.S.C. § 1983 – 14th Amendment Due Process
### Fabrication of Evidence
### (Defendant Officers)

86.     Each paragraph of this Complaint is incorporated as if restated fully herein.

87.     In the manner described above and alleged herein, throughout the investigation Defendant Officers fabricated reports.

88.     In the manner described above and alleged herein, throughout the investigation Defendant Officers used investigative techniques that were so coercive and abusive that they knew or should have known those techniques would yield false information.

89.     In the manner described above and alleged herein, Defendant Officers continued their investigation of Nash despite the fact they knew or should have known he was innocent.

90.     Defendant Officers' acts and/or omissions described herein were committed with deliberate indifference of Nash's constitutional rights.

91.     Defendant Officers' acts and/or omissions described herein "shock the conscience" and violate Nash's substantive due process rights.

92.     The charges against Nash were based on the fabrication of evidence described in this Count.

WHEREFORE, Plaintiff, Alprentiss Nash, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorney's fees, and costs against Defendants as well as any other relief this Court deems just and appropriate

## COUNT III
### 42 U.S.C. § 1983
### Failure to Intervene
### (Defendant Officers)

93.     Each paragraph of this Complaint is incorporated as if restated fully herein.

94.     In the manner described above and alleged herein, during the constitutional violations described above, Defendant Officers stood by without intervening to prevent the misconduct, including but not limited to the concealment and/or destruction of material exculpatory and impeachment evidence.

95.     As a result of Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

96.     The misconduct described in this Count was objectively unreasonable and was undertaken with malice and willful indifference to Plaintiff's constitutional rights.

WHEREFORE, Plaintiff, Alprentiss Nash, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorney's fees, and costs against Defendants as well as any other relief this Court deems just and appropriate.

## COUNT IV
### 42 U.S.C. § 1983
### Conspiracy to Deprive Plaintiff of his Constitutional Rights
### (Defendant Officers)

97.     Each paragraph of this Complaint is incorporated as if restated fully herein.

98.     In the manner described above and alleged herein, Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Plaintiff of exculpatory and

impeachment information to which he was lawfully entitled and which would have led to either his not being charged, his acquittal, or his more timely exoneration.

99.     In the manner described above and alleged herein, Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deliberately fabricate evidence against Plaintiff, causing him to be arrested, charged, and convicted.

100.     Defendant Officers, acting in concert among and between themselves and with unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

101.      In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to arresting Plaintiff without probable cause, fabricating and improperly suggesting identification evidence, withholding material exculpatory and impeachment evidence, and committing perjury during hearings and trials.

102.     The misconduct described in this count was undertaken with malice, willfulness, and/or reckless indifference to Plaintiff's rights.

103.     Said conspiracy and overt acts were continued from on or about April 30, 1995, through to the present.

104.     The conspiracy proximately caused the injuries to Plaintiff as set forth above.

WHEREFORE, Plaintiff, Alprentiss Nash, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorney's fees, and costs against Defendants as well as any other relief this Court deems just and appropriate.

## COUNT V
### Illinois Law
### Malicious Prosecution
### (Defendant Officers)

105.    Each paragraph of this Complaint is incorporated as if restated fully herein.

106.    In the manner described above and alleged herein, Defendant Officers knowingly and maliciously initiated and/or caused judicial proceedings to continue against Plaintiff knowing they lacked probable cause to do so.

107.    Defendants created false or incomplete police reports and/or made false and/or incomplete statements to other police officers, the prosecutors, and in court regarding the criminal investigation in this matter.

108.    Defendants instituted the judicial proceedings and/or caused them to continue against Plaintiff with malice, and with willful and wanton disregard for the truth of the allegations asserted against Plaintiff.

109.    This prosecution was terminated in Plaintiff's favor on August 30, 2012 when all charges were *nolle prosequi*.  That the termination of proceedings is indicative of innocence is demonstrated by the certificate of innocence issued on November 9, 2012.

110.    Defendants are liable for the prosecution because it was proximately caused by their unlawful actions as set forth above.

111.    These actions directly and proximately caused the injuries and damages to Plaintiff as claimed above and constitute the tort of malicious prosecution under Illinois law.

WHEREFORE, Plaintiff, Alprentiss Nash, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, and costs against Defendants as well as any other relief this Court deems just and appropriate.

**COUNT VI**
**Illinois Law**
**Intentional Infliction of Emotional Distress**
**(Defendant Officers)**

112.     Each paragraph of this Complaint is incorporated as if restated fully herein.

113.     In the manner described above and alleged herein, the acts and conduct of Defendant Officers were extreme and outrageous.  Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff.

114.     Said actions were undertaken with malice, willfulness, and with reckless indifference to the rights of Plaintiff.

115.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered damages, including severe emotional distress and anguish.

WHEREFORE, Plaintiff, Alprentiss Nash, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, and costs against Defendants as well as any other relief this Court deems just and appropriate.

**COUNT VII**
**Illinois Law**
**Conspiracy**
**(Defendant Officers)**

116.     Each paragraph of this Complaint is incorporated as if restated fully herein.

117.     In the manner described above and alleged herein, Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to maliciously prosecute Plaintiff without probable cause and intentionally inflict emotional distress.

118.     In furtherance of this conspiracy, Defendants committed the overt acts as set forth

above, including but not limited to the arrest of Plaintiff without probable cause, the coercion of witness statements, the manipulation and falsification of police reports, the concealment and/or destruction of material exculpatory and impeachment evidence, and the knowing presentation of fabricated evidence to initiate and continue proceedings against Plaintiff maliciously.

119.     Said conspiracy and overt acts were continued from on or about April 30, 1995, through to the present.

120.     The conspiracy proximately caused the injuries to Plaintiff as set forth above.

WHEREFORE, Plaintiff, Alprentiss Nash, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, and costs against Defendants as well as any other relief this Court deems just and appropriate.

**COUNT VIII**
**745 ILCS 10/9-102 – Indemnification**
**(Defendant City of Chicago)**

121.     Each paragraph of this Complaint is incorporated as if restated fully herein.

122.     Defendant City of Chicago was the employer of each of the Defendant Officers at all times relevant to this complaint, as set forth above.

123.     All of the individually named Defendant Officers were at all relevant times acting within the course and scope of their employment.

124.     Pursuant to 745 ILCS 10/9-102, the governmental entity set forth above is liable to pay all judgments and settlements entered against each of its employees for the claims set forth above.

WHEREFORE, pursuant to 745 ILCS 10/9-102, Plaintiff, Alprentiss Nash, demands judgment against Defendant City of Chicago in the amounts awarded to Plaintiff against the

individual Defendants by way of judgment or settlement, including any and all amounts awarded for damages, costs, and attorney's fees.

**COUNT IX**
**Respondeat Superior**
**(Defendant City of Chicago)**

125.    Each paragraph of this Complaint is incorporated as if restated fully herein.

126.    At all times relevant to this complaint the Defendant Officers acted as agents of, and in the scope of their employment with, Defendant City of Chicago.

127.    Defendant City of Chicago is liable for the torts of the police officer Defendants for their violations of state law under the doctrine of *respondeat superior.*

WHEREFORE, Plaintiff, Alprentiss Nash, demands judgment against Defendant City of Chicago in the amounts awarded to Plaintiff against the individual Defendants by way of judgment or settlement, including any and all amounts awarded for damages, costs, and attorney's fees.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

/s/ Kathleen T. Zellner
Kathleen T. Zellner

Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois  60515NA
(630) 955-1212
Atty No: 618457