## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

YVETTE MARTIN as Special Administrator )
of the Estate of ALPRENTISS NASH, )
                                    )
     Plaintiff,                       )
                                    )
     v.                               )     Case No: 14 CV 1493
                                    )
CHICAGO POLICE OFFICER MICHAEL )
BAKER, star no. 20316; CHICAGO )      Jury Trial Demanded
POLICE OFFICER JOHN SOLECKI )
no. 20378, and THE CITY OF CHICAGO, )
                                    )
     Defendants                   )

## FIRST AMENDED COMPLAINT

NOW COMES Plaintiff, YVETTE MARTIN as Special Administrator of the Estate of ALPRENTISS NASH, by and through his attorneys, KATHLEEN T. ZELLNER & ASSOCIATES, P.C., complaining of Defendants, CHICAGO POLICE OFFICERS MICHAEL BAKER, JOHN SOLECKI, and THE CITY OF CHICAGO, and states as follows:

### Jurisdiction and Venue

1.     This is a civil rights action brought pursuant to 42 U.S.C. § 1983 et seq. to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

2.     This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1367(a).

1

3.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in this judicial district and the parties resided in this judicial district at the time the events took place.

4.     Alprentiss Nash ("Nash") was at all relevant times herein a resident and citizen of the State of Illinois. Nash died on July 28, 2015. On October 7, 2015, his mother, Yvette Martin, was appointed the Special Administrator of his estate.

5.     Defendant Michael Baker ("Defendant Baker") was at all times relevant herein employed as a police officer in the Chicago Police Department.

6.     Defendant John Solecki ("Defendant Solecki") was at all times relevant herein employed as a police officer in the Chicago Police Department.

7.     Defendant City of Chicago is a duly incorporated municipal corporation and at all relevant times was the employer of Defendants Baker and Solecki (collectively "Defendant Officers"). The City of Chicago is liable for the wrongful acts of the Defendant Officers while acting within the scope of their employment, pursuant to its statutory obligation to indemnify them.

8.     Each of the Defendant Officers engaged in the conduct complained of under the color of state law and in the course and scope of his employment as a police officer with the City of Chicago.

9.     Each of the Defendant Officers are sued in their individual capacity.

### Allegations of Fact

*Nash's Prior Run-In with Area 2 Officers*

10.     In the winter of 1994, Nash was stopped and searched by two Area 2 Chicago police officers without probable cause or reasonable suspicion. The officers

2

found a bag of marijuana.  The officers told Nash that they were not going to arrest him, but they were going to take all of his money and his beeper.  They told him that he would "be sorry" if he told anyone.

11.     Nash had told people in the neighborhood about being robbed by two Area 2 police officers.

12.     Both Defendant Officers were Area 2 officers.

### Murder of Leon Stroud

13.     Leon Stroud ("Stroud") lived on the 11000 block of Wentworth Avenue in Chicago, Illinois.  He was a noted "bootlegger" in the neighborhood.  He sold alcohol, cigarettes, and crack cocaine out of his home.

14.     At around 1:45 p.m. on April 30, 1995, three masked men entered Stroud's home and robbed him.  One of the masked men shot Stroud in the chest.

15.     A woman opened the door to a back bedroom in Stroud's home and looked out into the living room.  She saw the three masked men, one of whom was holding a handgun.  The woman closed the door and the three masked men fled from the home.

16.     One of the robbers' masks was left at the scene.  The mask was taken into custody by the police, but it was not tested for DNA, fingerprints, or any other forensic evidence.

### Jean Collins Advises Police Officer There Were Three Masked Men

17.     Jean Collins advised investigators that she was in the back bedroom of the Stroud home when she heard a gunshot.  She opened the bedroom door and

3

looked down the hallway. There she saw <u>three masked men</u>, one of whom was holding a gun. Ms. Collins did not see anyone other than the three masked men and Stroud.

18.     Ms. Collins stated that she immediately closed the door and fled alone out the bedroom window. She turned toward the gangway between Stroud's home and the neighbor's home. Two of the masked men came running down the gangway and knocked her over.

19.     Ms. Collins advised that she could not identify the men because of the masks.

### Matthew Rollins Confirms There Were Three Men, Identifies Alvin Wyatt

20.     Matthew Rollins ("Rollins") advised investigators that, minutes before the shooting, he observed Alvin Wyatt ("Wyatt") emerge from the Stroud home.

21.     Rollins told investigators that he then observed Wyatt walk down the street and into the gangway between his home and Wyatt's house to the south. Wyatt met with <u>two</u> other men in the gangway.

22.     Rollins <u>could not identify</u> either of the other men, as they faced away from him and he could not view their faces from his vantage point.

23.     Rollins advised investigators that the three men walked in the direction of Stroud's home.

24.     Rollins also advised investigators that after he heard a gunshot, he observed Wyatt flee from the Stroud home.

25.     Wyatt was subsequently taken into custody and interviewed by investigators.  Wyatt denied playing any role in the home invasion and murder or knowing who did.

### Paul Harris Places Himself at the Scene with Motive

26.     Investigators learned that Paul Harris ("Harris") was also seen around the Stroud home at the time of the murder.

27.     Harris was interviewed by investigators at the scene.

28.     Harris admitted that he was inside the home at the time of the home invasion and murder.  He claimed, however, that he was an innocent bystander to a robbery gone wrong by a lone masked man who entered Stroud's home, robbed everyone therein, and shot Leon Stroud.

29.     Harris stated that he could not identify the alleged robber.

30.     Harris claimed that after the shooting he ran into the back bedroom where Collins was.  He claimed that he then helped Collins out the window, before exiting the window himself.

31.     Because they had already interviewed Collins, investigators knew Harris's statements were false.

32.     In addition to admitting being at the scene at the time of the murder and providing a false statement, Harris admitted to police that he knew Stroud had a lot of money, that he knew Stroud kept his money in his wallet, that Harris had no money—only a quarter to his name, that Harris smoked crack cocaine, and that Harris knew Wyatt very well.  The investigators were aware that Harris was in the

5

same gang as Wyatt. It was clear that Wyatt and Harris were two of the three men seen by Collins and Rollins.

### Nash Is Framed

33.     Rollins was re-interviewed by Defendants Baker and Solecki hours after the shooting. Defendant Officers were aware that Rollins was a close friend of Harris's.

34.     Rollins stated for the first time that he saw only one man in the alley with Wyatt. Rollins further stated that he did not and could not identify the (now one) other person in the alley.

35.     On information and belief, in a rush to close the case, Defendant Officers physically and/or verbally coerced Rollins to change his statement to align with Harris's.

36.     Defendant Officers knew that Rollins' new statement was completely unreliable.

37.     Seeing an opportunity to quickly resolve a case involving the death of a bootlegger in a poor neighborhood by arresting Nash, a drug dealer from the neighborhood who had been claiming to others that Area 2 officers had robbed him, Defendants conspired between themselves and with others to frame Nash.

38.     Investigators re-interviewed Wyatt and utilized physically and/or verbally coercive techniques in an attempt to get Wyatt to state that he had met one person in the gangway and it was that person who committed the shooting. Among

other things, investigators told Wyatt that he would not be charged and would not go to jail if he agreed to the story presented to him.

39.     Wyatt agreed to the story. He stated he did meet a man in the gangway. He explained that this man proposed robbing Stroud, and this man eventually shot Stroud during the robbery. Wyatt only knew the man as "Moose."

40.     On information and belief, the Defendant Officers were aware of the techniques utilized to coerce and encourage Wyatt, but did not act to prevent those techniques from being utilized. Defendant Officers did not disclose the techniques used or the unreliability of Wyatt's statement to the prosecutors or defense before, during, or after trial.

41.     Wyatt knew Nash by name and owed him money at the time. He had purchased drugs from Nash earlier that day. Wyatt knew Nash's nickname was "Lemeke," not "Moose."

42.     "Moose" was the nickname of Demetrius Loggers, another man who lived in the neighborhood.

43.     On information and belief, Defendant Officers were aware that Loggers's nickname was "Moose."

44.     As alleged in further detail below, Loggers's DNA was discovered on the mask found at the scene.

45.     Defendants Baker and Solecki and others drove Wyatt to Nash's home. Defendant Officers retrieved a photo of Nash from the residence. They brought the photo out to the car and showed Wyatt.

46. On information and belief, Wyatt repeatedly denied that the man in the photo was "Moose." He told them the man in the photo was Nash, also known as "Lemeke."

47. On information and belief, Defendants Baker and Solecki, used physically and/or verbally coercive techniques in an effort to get Wyatt to identify the man in the photo as "Moose." Among other things, Defendants told Wyatt that he would be charged with murder and go to jail unless he identified the person as "Moose." Wyatt eventually gave in and stated that the person in the photograph was indeed "Moose."

48. On information and belief, Defendants Baker and Solecki, fabricated police reports to reflect a positive identification of Nash as "Moose" and they did not disclose that the identification had only been made after denial and as the result of coercion and manipulation.

### Defendants Arrest Nash and Search the Residence of His Girlfriend

49. Later that evening, Defendant Officers apprehended Nash without probable cause. Nash proclaimed his innocence of any wrongdoing.

50. Having taken custody of Nash, Defendant Officers and others traveled to the nearby residence of Lakedia Leverette.

51. Defendant Officers entered the home allegedly in search of a gun.

52. Defendant Officers removed and/or cause to be removed a bag from Leverette's residence. The bag was from the store "Breyers."

53. Nash had obtained the Breyers bag earlier in the day when he had purchased clothing.

54. The bag constituted conclusive evidence that Nash had been shopping far from the scene of the Stroud murder at or about the time of the murder and thus established Nash had no involvement in the murder.

55. Knowing that the bag was conclusive support for Nash's innocence, Defendant Officers caused the bag never to be inventoried or disclosed to Nash, his defense attorneys, prosecutors, or any member of the Cook County State's Attorney's Office.

**Nash is Interviewed**

56. Nash was interviewed by Defendants Solecki and Baker at Area 2 Headquarters.

57. Nash continued to set forth his airtight and verifiable alibi.

58. Nash explained his whereabouts throughout the entire day.

59. Nash explained how he had taken a cab to Maxwell Street to shop.

60. Nash explained that he had shopped at Breyers. He purchased a pair of blue overalls, some navy blue gym shoes, a three quarter length black bloomers jacket, and a snake skin baseball hat.

61. Nash explained that the clothing items were placed in a bag supplied by the Breyers store.

62. Nash told the officers he had changed into his new clothes after purchasing them.

63.     Nash told the officers she had visited his girlfriend, Lakedia Leverette prior to his arrest.

*Unduly Suggestive Lineups*

64.     Nash was placed in a line up and due to improperly suggestive techniques, Rollins falsely identified Nash.  Defendant Officers knew that Rollins identification of Nash was unreliable.

65.     Defendant Officers knew that Rollins' identification was false because Rollins had not previously identified Nash despite knowing him for years by name and nickname.  Rollins had repeatedly stated to Defendants Baker, Solecki, and other officers that he would not be able to identify anyone other than Wyatt. Defendant Officers and other officers were aware that Rollins, based on his story about where the individuals were situated in the gangway and the angle from which he viewed them, it would have been impossible for Rollins to identify anyone other than Wyatt. Defendant Officers caused this information to be concealed from the prosecutors and defense.

66.     Harris was brought to the police station for a lineup. On information and belief, Police Officers conducted the lineup in an improperly suggestive manner, and induced Rollins to falsely identify Nash. Defendant Officers caused this information to be concealed from the prosecutors and defense.

67.     Harris's identification was based solely on Nash's voice and stature, as the gunman was wearing a mask.

68.     Defendant Officers knew Harris's identification was false. Defendant Officers knew that Harris had known Nash for years, such that he would have

known Nash's voice and stature. If Nash was the shooter, Harris would have been able to identify Nash at the scene, as he would have recognized his voice and stature in the Stroud home.

*Defendant Officers Conceal All Exculpatory Evidence*

69. In the manner described above and below, Defendant Officers maliciously, intentionally, and with reckless disregard to Nash's constitutional rights, concealed and withheld material exculpatory and impeachment information from the prosecutors and defense before, during, and after Nash's criminal trial.

70. Defendants Baker and Solecki concealed from the prosecutors and defense the fact they had taken, or caused to be taken, the Breyers bag from Leverette's residence.

71. Defendants Baker and Solecki never disclosed, and caused others never to disclose the fact they had taken, or caused to be taken, the Breyers bag from Leverette's residence.

72. On information and belief, Defendants Baker and Solecki concealed from the prosecutors and defense the fact they had confirmed Nash's alibi.

73. On information and belief, Defendants Baker and Solecki concealed from the prosecutors and defense the fact that Wyatt had stated that Nash was not "Moose," and that he only agreed to say Nash was "Moose" after physical and/or verbal coercion and manipulation from Defendant Officers. Defendant Officers falsified reports to reflect an identification of Nash as "Moose" without denial, equivocation, coercion, or manipulation.

74.     On information and belief, Defendant Officers concealed from the prosecutors and defense the fact that "Moose" was the nickname of Demetrius Loggers.

75.     Defendant Officers concealed from the prosecutors and defense exculpatory and impeachment information learned during interviews with Jean Collins, wherein she stated that there were <u>three masked men in the home</u>, that she did not see anyone other than the three masked men in the home, that she left out the back bedroom window <u>alone</u>, and that two of the masked men knocked her over while they were fleeing from the home.

76.     Defendants Baker and Solecki concealed from the prosecutors and defense the exculpatory fact that they coerced and/or manipulated Rollins to change his story from seeing three men in the gangway to just two.

77.     Defendant Officers concealed from the prosecutors and defense the fact that Rollins had consistently stated he could not identify anyone other than Wyatt in the gangway prior to the murder.

78.     Defendant Officers concealed from the prosecutors that the unduly suggestive conduct that occurred during the lineups and the unreliability of Rollins's and Harris's false identifications.

***Nash is Charged and Convicted***

79.     No physical evidence connected Nash to the crime in any way. The State's decision to press charges and its case to the jury was based entirely on Defendant Officers' false representations and reports regarding the manipulated,

12

fabricated, and false statements and identifications by Rollins, Wyatt, and Harris, as well as Defendant Officers' malicious concealment of material evidence.

80.     Defendant Officers continued to coerce and/or otherwise manipulate and influence witnesses, including Wyatt, Rollins, and Harris, to testify falsely at trial.

81.     Nash's trial counsel argued that Wyatt and Harris committed the robbery and murder together with a third party.

82.     At the conclusion of his trial, Nash was convicted of murder. For the next 17 years, Nash worked tirelessly to prove his innocence.

### DNA Evidence Exonerates Nash

83.     On October 28, 2007, Nash filed a *pro se* motion pursuant to section 116-3 of the Code of Criminal Procedure seeking DNA testing on the mask discovered at the scene.

84.     On March 5, 2010, the Illinois Appellate Court granted the motion, noting that "the evidence presented against the defendant at trial was significantly less than conclusive." The appellate court pointed out that Rollins originally told an officer that he saw two men in the gangway with Wyatt; that it made no sense for Harris to identify Nash by voice and stature for the first time at the station because he *knew* Nash and should have been able to identify his voice when he heard it; that Wyatt did not initially implicate anyone and only did so after he was improperly incentivized by the officers; and that any DNA on the mask other than Nash's would go a long way to showing his actual innocence.

85.    On September 22, 2010, Nash was excluded as a contributor to either of the DNA profiles discovered on the mask.

86.    Subsequent testing performed on the mask revealed a major profile that once again excluded Nash.  The major profile was searched against the DNA Index and detected an association with Demetrius Loggers, also known as "Moose."

### Post-Conviction Proceedings and Dismissal of All Charges

87.    On February 24, 2011, Nash filed a petition for post-conviction relief, asserting actual innocence based upon the DNA results.  On August 30, 2012, the State withdrew its opposition, the petition was granted, and the State dismissed all pending charges.

88.    On September 7, 2012, Nash filed a petition for certificate of innocence. This petition was unopposed by the State and granted on November 9, 2012.

### Nash's Damages

89.    Nash was wrongfully incarcerated from April 30, 1995 to August 30, 2012.  As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Nash sustained injuries and damages including loss of his freedom for over 17 years, pain and suffering, severe mental anguish, emotional distress, loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations,

reading, television, movies, travel, enjoyment, and freedom of speech and expression.

## COUNT I
### 42 U.S.C. § 1983 - 14th Amendment Due Process
### Destruction and/or Concealment of Material Exculpatory and Impeachment Evidence
### (Defendant Officers)

90.    Each paragraph of this Complaint is incorporated as if restated fully herein.

91.    In the manner described above and alleged herein, Defendant Officers concealed and/or destroyed material exculpatory and impeachment evidence from Nash and from prosecutors before, during, and after Nash's criminal trial, causing the prosecution against Nash to commence and continue for more than 17 years.

92.    In concealing and/or destroying the material exculpatory and impeachment evidence, Defendant Officers acted maliciously, intentionally, and with willful and wanton disregard for Nash's constitutional rights.

93.    Defendant Officers' actions directly and proximately caused the injuries and damages to Nash as claimed above, and constitute a due process violation under the 14th Amendment of the U.S. Constitution.

WHEREFORE, Plaintiff, Yvette Martin as Special Administrator of the Estate of Alprentiss Nash, respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, awarding compensatory damages,

attorney's fees, and costs against Defendants as well as any other relief this Court deems just and appropriate.

## COUNT II

**42 U.S.C. § 1983**
**Failure to Intervene**
**(Defendant Officers)**

94.     Each paragraph of this Complaint is incorporated as if restated fully herein.

95.     In the manner described above and alleged herein, during the constitutional violations described above, Defendant Officers stood by without intervening to prevent the misconduct, including but not limited to the concealment and/or destruction of material exculpatory and impeachment evidence.

96.     As a result of Defendant Officers' failure to intervene to prevent the violation of Nash's constitutional rights, Nash suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

97.     The misconduct described in this Count was objectively unreasonable and was undertaken with malice and willful indifference to Nash's constitutional rights.

WHEREFORE, Plaintiff, Yvette Martin as Special Administrator of the Estate of Alprentiss Nash, respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, awarding compensatory damages,

attorney's fees, and costs against Defendants as well as any other relief this Court deems just and appropriate.

**COUNT III**
**42 U.S.C. § 1983**
**Conspiracy to Deprive of Constitutional Rights**
**(Defendant Officers)**

98.   Each paragraph of this Complaint is incorporated as if restated fully herein.

99.   In the manner described above and alleged herein, Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Nash of exculpatory and impeachment information to which he was lawfully entitled and which would have led to either his not being charged, his acquittal, or his more timely exoneration.

100.   In the manner described above and alleged herein, Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deliberately fabricate evidence against Nash, causing him to be arrested, charged, and convicted.

101.   Defendant Officers, acting in concert among and between themselves and with unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

102.   In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to arresting Nash

without probable cause, coercing false information and improperly suggesting identification evidence, withholding material exculpatory and impeachment evidence, and committing perjury during hearings and trials.

103.     The misconduct described in this count was undertaken with malice, willfulness, and/or reckless indifference to Nash's rights.

104.     Said conspiracy and overt acts were continued from on or about April 30, 1995, through to the present.

105.     The conspiracy proximately caused the injuries to Nash as set forth above.

WHEREFORE, Plaintiff, Yvette Martin as Special Administrator of the Estate of Alprentiss Nash, respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, awarding compensatory damages, attorney's fees, and costs against Defendants as well as any other relief this Court deems just and appropriate.

## COUNT IV
### Illinois Law
### Malicious Prosecution
### (Defendant Officers)

106.     Each paragraph of this Complaint is incorporated as if restated fully herein.

107.     In the manner described above and alleged herein, Defendant Officers knowingly and maliciously initiated and/or caused judicial proceedings to continue against Nash knowing they lacked probable cause to do so.

108.    Defendants created false or incomplete police reports and/or made false and/or incomplete statements to other police officers, the prosecutors, and in court regarding the criminal investigation in this matter.

109.    Defendants instituted the judicial proceedings and/or caused them to continue against Nash with malice, and with willful and wanton disregard for the truth of the allegations asserted against Nash.

110.    This prosecution was terminated in Nash's favor on August 30, 2012 when all charges were *nolle prosequi*.    That the termination of proceedings is indicative of innocence is demonstrated by the certificate of innocence issued on November 9, 2012.

111.    Defendants are liable for the prosecution because it was proximately caused by their unlawful actions as set forth above.

112.    These actions directly and proximately caused the injuries and damages to Nash as claimed above and constitute the tort of malicious prosecution under Illinois law.

WHEREFORE, Plaintiff, Yvette Martin as Special Administrator of the Estate of Alprentiss Nash, respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, awarding compensatory damages, attorney's fees, and costs against Defendants as well as any other relief this Court deems just and appropriate.

## COUNT V
### Illinois Law
### Intentional Infliction of Emotional Distress
### (Defendant Officers)

113.    Each paragraph of this Complaint is incorporated as if restated fully herein.

114.    In the manner described above and alleged herein, the acts and conduct of Defendant Officers were extreme and outrageous. Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Nash.

115.    Said actions were undertaken with malice, willfulness, and with reckless indifference to the rights of Nash.

116.    As a direct and proximate result of Defendants' wrongful acts, Nash suffered damages, including severe emotional distress and anguish.

WHEREFORE, Plaintiff, Yvette Martin as Special Administrator of the Estate of Alprentiss Nash, respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, awarding compensatory damages, attorney's fees, and costs against Defendants as well as any other relief this Court deems just and appropriate.

## COUNT VI
### Illinois Law
### Conspiracy
### (Defendant Officers)

117.    Each paragraph of this Complaint is incorporated as if restated fully herein.

118.   In the manner described above and alleged herein, Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to maliciously prosecute Nash without probable cause and intentionally inflict emotional distress.

119.   In furtherance of this conspiracy, Defendants committed the overt acts as set forth above, including but not limited to the arrest of Nash without probable cause, the coercion of witness statements, the manipulation and falsification of police reports, the concealment and/or destruction of material exculpatory and impeachment evidence, and the knowing presentation of fabricated evidence to initiate and continue proceedings against Nash maliciously.

120.   Said conspiracy and overt acts were continued from on or about April 30, 1995, through to the present.

121.   The conspiracy proximately caused the injuries to Nash as set forth above.

WHEREFORE, Plaintiff, Yvette Martin as Special Administrator of the Estate of Alprentiss Nash, respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, awarding compensatory damages, attorney's fees, and costs against Defendants as well as any other relief this Court deems just and appropriate.

## COUNT VII
### 745 ILCS 10/9-102 – Indemnification
### (Defendant City of Chicago)

122.    Each paragraph of this Complaint is incorporated as if restated fully herein.

123.    Defendant City of Chicago was the employer of each of the Defendant Officers at all times relevant to this complaint, as set forth above.

124.    The individually named Defendant Officers were at all relevant times acting within the course and scope of their employment.

125.    Pursuant to 745 ILCS 10/9-102, the governmental entity set forth above is liable to pay all judgments and settlements entered against each of its employees for the claims set forth above.

WHEREFORE, pursuant to 745 ILCS 10/9-102, Plaintiff, Yvette Martin as the Special Administrator of the Estate of Alprentiss Nash, demands judgment against Defendant City of Chicago in the amounts awarded to Plaintiff against the individual Defendants by way of judgment or settlement, including any and all amounts awarded for damages, costs, and attorney's fees.

## COUNT VIII
### Respondeat Superior
### (Defendant City of Chicago)

126.    Each paragraph of this Complaint is incorporated as if restated fully herein.

127.    At all times relevant to this complaint the Defendant Officers acted as agents of, and in the scope of their employment with, Defendant City of Chicago.

128.    Defendant City of Chicago is liable for the torts of the police officer Defendants for their violations of state law under the doctrine of *respondeat superior.*

WHEREFORE, Plaintiff, Yvette Martin as the Special Administrator of the Estate of Alprentiss Nash, demands judgment against Defendant City of Chicago in the amounts awarded to Plaintiff against the individual Defendants by way of judgment or settlement, including any and all amounts awarded for damages, costs, and attorney's fees.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

/s/ Kathleen T. Zellner
Kathleen T. Zellner
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois  60515
Ph:  (630) 955-1212
Email:  kathleen.zellner@gmail.com